GOLDAUSKAS et al., Appellants,

v.

ELYRIA FOUNDRY COMPANY, INC. et al., Appellees.

[Cite as *Goldauskas v. Elyria Foundry Co.* (2001), 145 Ohio App.3d 490.]

Court of Appeals of Ohio,
Ninth District, Lorain County.

No. 00CA007744.

Decided Aug. 22, 2001.

George W. White and Robert J. Zavesky, for appellants.

Joseph C. Domiano and M. David Smith, for appellees.

BATCHELDER, Presiding Judge.

Appellants, Peter and his wife Tanya Goldauskas and the law firm of Berger & Zavesky Co., L.P.A.,[1] appeal the judgment of the Lorain County Court of Common Pleas. We modify the trial court's judgment.

## I

In 1995, Mr. Goldauskas began working at the Elyria Foundry Company, Incorporated, appellee, a metal foundry and casting plant. His job involved pulling casings out of the foundry pit, breaking apart molds, and loading the castings for shipment. The castings and molds were often tall, and, therefore, were often placed in a deep pit in the foundry. In order to accomplish his job, Mr. Goldauskas was required to attach a chain from a crane to the top of the mold or casting. The only way to access the top of the molds was, apparently, by riding the chains of the cranes, as no ladders were provided. On June 30, 1998, Mr. Goldauskas was, apparently, instructed to ride the chain to the top of a twenty-five-foot-tall casting flask so that he could disassemble it. However, the crane malfunctioned and did not stop lifting at the appropriate time; rather, it lifted Mr. Goldauskas higher and higher. Finally, the crane reached its limit switch, which sheared off a pin and sent Mr. Goldauskas and the chains on which he was riding plummeting to the floor, some thirty feet below. Momentarily, Mr. Goldauskas landed atop the mold onto which he was planning to attach the chain that he had been riding. However, he was knocked off the mold by falling debris. Mr. Goldauskas was injured as he fell from the top of the mold, landing upon the concrete floor far below. At that point, a block broke free from the crane and plummeted to the ground. It landed atop Mr. Goldauskas's leg, severing it from his body. An ambulance was immediately summoned; however, despite medical care, Mr. Goldauskas' leg had to be amputated.

---

1. The law firms of Berger & Zavesky Co., L.P.A. and Friedman, Domiano & Smith Co., L.P.A. are the real parties in interest. The dispute both below and in this appeal centers on the division of the contingent fee between the two firms.

Mr. Goldauskas retained Friedman, Domiano & Smith Co., L.P.A. ("the Friedman firm") on or about July 2, 1998, as counsel to pursue an action in tort against Elyria Foundry for the injuries that he had suffered in his fall. The Friedman firm filed a complaint on his behalf in the Lorain County Court of Common Pleas on December 4, 1998. The firm filed interrogatories and requests for the production of documents on the same day. The Friedman firm pursued discovery in the following months. Depositions were taken of Lowell Morrow, a supervisor in the area in which Mr. Goldauskas worked and witness to the accident, Floyd Baum, vice-president of Elyria Foundry, Tod Blair, safety manger at Elyria Foundry, and Duane Warner, night shift supervisor for shakeout,[2] among other depositions and interviews.

Mr. Goldauskas then terminated his relationship with the Friedman firm and retained Berger & Zavesky Co., L.P.A. ("the Berger firm") in November 1999. The Berger firm continued the discovery process, moving for additional time to produce expert reports on November 24, 1999. The trial court granted additional time on December 2, 1999. On May 5, 2000, Elyria Foundry moved for summary judgment. The Berger firm filed its brief in opposition to summary judgment on May 31, 2000, and attached numerous depositions and expert reports. A number of these documents were produced in part or *in toto* through the efforts of the Berger firm, after the Friedman firm had been discharged. Among these was that of Richard E. Harkness, who prepared an expert report detailing the causal chain leading up to the accident, Gerald C. Rennell, who provided an expert report on the safety conditions and procedures at Elyria Foundry, Scott Shamblin, a crane operator at Elyria Foundry, Rodney Coker, a crane operator at Elyria Foundry, and Jeff Lauren, an employee at Elyria Foundry. However, the Berger firm also used the deposition of Tod Blair, safety manager at Elyria Foundry, the deposition of Greg Fretch, a night supervisor at Elyria Foundry, which had been produced solely through the efforts of the Friedman firm, and a discovery deposition taken by Elyria Foundry during Mr. Goldauskas's representation by the Friedman firm. Further, Harkness and Rennell had both been originally retained by the Friedman firm, and, hence, had begun work on their reports prior to the Friedman firm's dismissal and the Berger firm's entry into the case. The motion for summary judgment was not ruled upon, however, as the Berger firm settled Mr. Goldauskas's claim for a sealed[3] amount prior to the

---

**2.** At one point in the process of casting metal, removing it from the mold, and disassembling the mold, it becomes necessary to shake the sand from the mold, hence the term "shakeout."

**3.** The record contains the amount but, as it was sealed at the parties' request, this court will not mention the settlement amount in this opinion although we have reviewed that document in reaching our opinion.

trial court's ruling. The trial court was notified of the settlement on June 13, 2000.

In a conference between Domiano of the Friedman firm and Zavesky of the Berger firm, Mr. Domiano "asked [Zavesky] if [he] would protect [the Friedman firm's] interest, and [Zavesky] told [Domiano] that [he] would, and [Zavesky] asked [Domiano] to please send [Zavesky] a letter." Later, on March 16, 2000, the Friedman firm sent a letter to the Berger firm stating that "[m]y firm is seeking to recover $25,077.33 [in] quantum meruit." Further, on March 31, 2000, the Friedman firm mailed the Berger firm a document entitled "Notice of Charging Lien" in regard to the services rendered by the Friedman firm. On June 30, 2000, the Friedman firm filed a motion to declare and enforce the charging lien on the settlement proceeds and documents in support of the motion in the Lorain County Court of Common Pleas. The Berger firm filed a brief and exhibits in opposition on July 7, 2000. Numerous depositions were taken and discovery was had. On August 10, 2000, Mr. Goldauskas and Elyria Foundry filed a motion to dismiss the cause between them with prejudice. The trial court dismissed the cause between those parties on August 14, 2000. The matter of the division of attorney fees was heard by the trial court on, *inter alia*, October 26, 2000 and November 22, 2000. On December 1, 2000, the trial court entered judgment in favor of the Friedman firm in the amount of three hundred thousand dollars, fees and costs inclusive, with the balance of the contingency fee going to the Berger firm. This appeal followed.

## II

The Berger firm asserts three assignments of error. We will address each in due course, consolidating the Berger firm's first two assignments of error to facilitate review.

## A

### First Assignment of Error

"The trial court erred by not estopping the Friedman firm from claiming an amount of *quantum meruit* in excess of the agreed upon fee."

### Second Assignment of Error

"The trial court erred in denying appellants['] motion for a directed verdict."

The Berger firm avers that the trial court erred in that its decision was contrary to the evidence presented and applicable law. Essentially, the Berger firm argues that the Friedman firm was estopped from demanding more than the amount stated in its March 16, 2000 letter and that the trial court abused its

discretion in awarding the Friedman firm $300,000 in attorney fees. We find that the Friedman firm was not estopped, but agree that the trial court acted unreasonably in determining the fee in *quantum meruit* and modify its holding.

We will first address the Friedman firm's estoppel argument and then pass upon the award of fees in *quantum meruit.* "The purpose of equitable estoppel is to prevent actual or constructive fraud and to promote the ends of justice." *Ohio State Bd. of Pharmacy v. Frantz* (1990), 51 Ohio St.3d 143, 145, 555 N.E.2d 630. Further, "[t]he party claiming the estoppel must have relied on conduct of an adversary in such a manner as to change his position for the 'worse and that reliance must have been reasonable in that the party claiming estoppel did not know and could not have known that its adversary's conduct was misleading." *Id.*

The Berger firm argues that it relied upon the representations of the Friedman firm regarding the appropriate fee in *quantum meruit* to its detriment. However, an offer to settle must be transmitted by an attorney to the client, and it is the client's decision whether the settlement should be accepted. EC 7–7 and 7–8; *Paxton v. Dietz* (May 28, 1985), Franklin App. No. 84AP–972, unreported, 1985 WL 10300, at * 3 ("[T]he decision to accept or to make' settlement offers is one for the client rather than the attorney[.]"); *Rizzo v. Haines* (1989), 520 Pa. 484, 500–501, 555 A.2d 58 (holding that "[i]t was incumbent upon [the attorney], as a matter of law, to communicate all settlement offers to his client" and that it is "the client's choice to accept or reject a settlement offer"). Further, the attorney fee herein, pursuant to the fee agreements, is a fixed percentage of the amount recovered. Hence, it mattered not at all to the client, in terms of the amount he was to receive, what portion of that fee amount was demanded by the Friedman firm. Accordingly, we conclude that the Berger firm could not have ethically refused to settle the cause in the hopes of obtaining a higher verdict or settlement offer because the Friedman firm was demanding a large portion of the fee in *quantum meruit;* this decision is for the client. Therefore, we can find no reasonable detrimental reliance on the part of the Berger firm under either sufficiency or manifest weight review.

Next, the Berger firm challenges the trial court's determination of attorney fees in *quantum meruit.*

"A trial court called upon to determine the reasonable value of a discharged contingent-fee attorney's services in *quantum meruit* should consider the totality of the circumstances involved in the situation. The number of hours worked by the attorney before the discharge is only one factor to be considered. Additional relevant considerations include the recovery sought, the skill demanded, the results obtained, and the attorney-client agreement itself."

*Reid, Johnson, Downes, Andrachik & Webster v. Lansberry* (1994), 68 Ohio St.3d 570, 629 N.E.2d 431, paragraph three of the syllabus. "Other factors to be considered will vary, depending on the facts of each case." *Id.* at 576, 629 N.E.2d 431.

DR 2–106(B) gives guidance in determining the reasonableness of attorney fees, stating:

"* * * Factors to be considered as guides in determining the reasonableness of a fee include the following:

"(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

"(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

"(3) The fee customarily charged in the locality for similar legal services.

"(4) The amount involved and the results obtained.

"(5) The time limitations imposed by the client or by the circumstances.

"(6) The nature and length of the professional relationship with the client.

"(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

"(8) Whether the fee is fixed or contingent." *Id.* at fn. 3.

"Because the factors to be considered are based on the equities of the situation, those factors, as well as the ultimate amount of *quantum meruit* recovery by a discharged attorney, are matters to be resolved by the trial court within the exercise of its discretion." *Id.* at 577, 629 N.E.2d 431. An abuse of discretion means more than an error of judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. When applying the abuse-of-discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Freeman v. Crown City Mining, Inc.* (1993), 90 Ohio App.3d 546, 552, 630 N.E.2d 19.

In determining whether the fee awarded was appropriate and what the appropriate fee was, we will consider the factors enumerated in DR 2–106 and the factual and legal background of this matter as we find it to be relevant, as the "[o]ther factors to be considered will vary, depending on the facts of each case." *Lansberry,* 68 Ohio St.3d at 576, 629 N.E.2d 431. Mr. Goldauskas's claim was one in intentional tort against his employer, Elyria Foundry. Both the Berger firm and the Friedman firm agree that such a cause of action is difficult to maintain and prevail upon. Further, the evidence adduced below indicated that

the Friedman firm undervalued Mr. Goldauskas's claim. Mr. Goldauskas testified that the Friedman firm explained to him that his case was worth only about $100,000. Further, John Meros, Esq., the Friedman firm's expert, testified that he had seen an estimate of the value of Mr. Goldauskas's claim in the Friedman firm's file of $100,000. Domiano testified that he valued the case at between $750,000 and $1,000,000 after a jury trial. Hence, the Friedman firm would clearly have recommended that Mr. Goldauskas settled the matter for less than that amount rather than face the risk of a defense verdict at trial. Further, summary judgment is also highly risky in the estimation of both the Friedman firm and the Berger firm. Accordingly, to avoid such risk at summary judgment and upon trial by jury, a lower settlement amount would have been attractive prior to the trial court's ruling on summary judgment. It was the Berger firm that, marshaling additional depositions and full-scale expert reports, battled against Elyria Foundry's motion for summary judgment and, in doing so, obtained a settlement far in excess of the amount the Friedman firm expected to recover after trial. As the trial court noted, "[t]he negotiating of a settlement has to * * * be given a premium." Accordingly, the trial court awarded the Friedman firm $300,000 in *quantum meruit*. However, upon review of the record, we find this amount to be unreasonable as discussed below.

Pursuant to the contingent fee agreement the Friedman firm has with Mr. Goldauskas, the Friedman firm's contingent fee was to be forty percent. Accordingly, in the Friedman firm's estimation, the fee would have been between $200,000 and $400,000 *after* trial. The testimonies of the parties and their experts clearly show that the Friedman firm would have recommended settling the claim for less than that amount prior to trial and especially prior to summary judgment, which all believe is highly risky. Hence, we find the trial court's determination of attorney fees to be unreasonable, as it gave the Friedman firm the same amount as if, by its own estimation, it had pursued the cause through the perils of summary judgment and trial.

We further take into consideration the contract that the Friedman firm entered into with Mr. Goldauskas. Although questions as to its validity were raised during the proceedings below, no copy signed by any attorney at the Friedman firm was produced as is mandated by R.C. 4705.15. Further, some weight must be given to Domiano's own quantification of the *quantum meruit* figure prior to the Berger firm's settlement of the case for an amount far in excess of the Friedman firm's valuation of the matter. Domiano indicated that his *quantum meruit* recovery was valued at $25,077.33 in March 2000. Further, the testimony of the Berger firm's expert, Robert F. Linton, Esq., indicated that this amount was "value billing" in which the total value of the work is taken into account as all

members of the firm, including both legal and non-legal staff, are billed at $250 per hour.

Hence, we must determine what amount is appropriate in *quantum meruit.* The Friedman firm estimated the value of the cause of action to be between $750,000 and $1,000,000. Taking the higher end of this amount and multiplying it by the forty percent contingent fee amount yields a fee of $400,000. Domiano, in a letter dated June 26, 2000, stated that his firm was entitled to fifty percent of the fee obtained in *quantum meruit.* Fifty percent of $400,000 is $200,000. Hence, we find this amount to be the appropriate amount in *quantum meruit.* The trial court judge is highly experienced, observed the witnesses and had the opportunity to adjudge their credibility, and has experience in this area of law from his time in private practice. However, we must conclude that the award of $300,000 in attorney fees *quantum meruit* is unreasonable. Accordingly, we modify the trial court's entry of judgment lowering the amount to be received by the Friedman firm from $300,000 to $200,000, fees and expenses in the amount of $8,139.83 to be included in this amount. The balance of the contingent fee shall be distributed to the Berger firm.[4] The Berger firm's first and second assignments of error are sustained in part and, in remaining part, are overruled.

### B

### Third Assignment of Error

"The trial court erred in denying appellants' motion for a jury trial."

The Berger firm abandoned this argument during oral arguments before this court. Accordingly, we do not pass upon this assignment of error.

### III

The Berger firm's first and second assignments of error are sustained in part and overruled in part. The judgment of the Lorain County Court of Common Pleas is modified accordingly.

*Judgment accordingly.*

SLABY, J., concurs.

---

**4.** As the Indiana Supreme Court held in *Galanis v. Lyons & Truitt* (Ind.1999), 715 N.E.2d 858, 863, quoting *Saucier v. Hayes Dairy Products, Inc.* (La.1979), 373 So.2d 102, 108:

" '[O]nly one contingency fee should be paid by the client, the amount of the fee to be determined according to the highest ethical contingency percentage to which the client contractually agreed [and] * * * that fee should in turn be allocated between or among the various attorneys involved in handling the claim in question * * *.' " (Alterations original.)

CARR, Judge, dissenting.

I respectfully dissent because I feel that the Friedman firm agreed to a sum certain for its fees, and the trial court abused its discretion in awarding a different amount.